United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Antonio L. Green, Plaintiff | ) |
| | ) |
| v. | ) Civil Action No. 19-22444-Scola |
| | ) |
| Franklin Pineda et al., Defendants. | ) |

## Order Granting in Part and Denying in Part Motion for Summary Judgment

Before the Court is the Defendants' motion for summary judgment ("Motion"). (ECF No. 106). The Court has considered the Motion, the entire record, and is otherwise advised in the premises. As discussed below, the Court **grants in part and denies in part** the Motion.

### 1. Relevant Procedural Background

The Plaintiff filed a second amended complaint ("SAC"). The Plaintiff signed the SAC under penalty of perjury. (*Id.* at 14). ECF No. 35. Magistrate Judge Reid screened the SAC and issued a Report recommending that it be allowed to proceed on: (1) excessive force against Officer Pineda for closing the Plaintiff's arms and hands in a cell door flap; (2) failure to intervene against Major Green and Sgt. Burton for failing to intervene in Officer Pineda's alleged excessive force; and (3) failure to protect against Major Green for allegedly orchestrating a later assault on Plaintiff by correctional officers. (ECF No. 41 at 2–3, 18–24). The Court adopted the Report. (ECF No. 45).

The Defendants filed their Motion and supporting evidence. (ECF Nos. 105–07). The Court ordered the Plaintiff to respond to the Motion and cautioned him that he must support his response with "affidavits, depositions, and/or other sworn evidence." (ECF No. 108 at 1).

The Plaintiff filed a brief in opposition to the Motion ("Response"). (ECF No. 124). He did not sign the Response under penalty of perjury. (*Id.* at 24). In support, he submitted a statement of disputed facts ("Statement"), which he did not sign under penalty of perjury. (*Id.* at 29). Furthermore, he submitted a declaration in opposition to the Motion ("Declaration") that he failed to sign under penalty of perjury. (ECF No. 125 at 12). By contrast, the two inmate declarations that he submitted with his Declaration are signed under penalty of perjury. (ECF No. 125-1 at 2–3).

The Plaintiff's failure to sign the Response, Statement, and Declaration under penalty of perjury precludes the Court from considering the statements

1

therein as *evidence* when ruling on the Motion. *See United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. Ala.*, 941 F.2d 1428, 1444 n.36 (11th Cir. 1991) (en banc) ("The court on summary judgment may consider a declaration executed in accordance with [28 U.S.C. § 1746] as an affidavit." (citations omitted)); *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) ("[The prisoner's] statements in his verified complaint, sworn response to the officers' motion for summary judgment, and sworn affidavit attached to that response should have been treated as testimony by the district court." (citations omitted)).

The Plaintiff might respond that the Court's failure to consider these documents as evidence is improper because, in its order to respond to the Motion, it referenced only "sworn" evidence. A declaration signed under the penalty of perjury, this argument would continue, is not sworn evidence. This is because it is not "a voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths, such as a notary public." *Commodores Ent. Corp. v. McClary*, 324 F. Supp. 3d 1245, 1254 (M.D. Fla. 2018) (cleaned up). Rather, a declaration signed under penalty of perjury as provided in § 1746(2) is "an *unsworn* declaration . . . given the same force and effect as an affidavit." *Id.* (emphasis added).

This contention would not be persuasive. Because a declaration signed under penalty of perjury is given the same force and effect as an affidavit, and because "the terms declaration and affidavit are used interchangeably in common parlance and in case law," *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1303 n.2 (11th Cir. 2016) (cleaned up), a declaration signed under penalty of perjury may be regarded as a sworn affidavit or sworn evidence. *See id.* (referring to the statements in a declaration signed under penalty of perjury as "sworn statements"); *Houser v. United States*, 808 F. App'x 969, 971 n.3 (11th Cir. 2020) (per curiam) (referring to a declaration signed under penalty of perjury as a "sworn declaration" (citation omitted)). Furthermore, the SAC and the inmate declarations were signed under penalty of perjury, which shows that the Plaintiff knew the importance of verifying his submissions.

All the same, the Court's failure to treat these unverified documents as evidence does not prejudice the Plaintiff. In stating the facts on summary judgment, the Court relies heavily on Plaintiff's deposition testimony, which is largely consistent with the allegations in the SAC, Response, Declaration, and Statement. Furthermore, although the Court cannot treat the allegations in the Response, Declaration, and Statement as *evidence*, it has carefully reviewed the *arguments* in these documents and considered them when ruling on the Motion. In short, based on review of the entire record, the Court finds that its

failure to treat these unverified documents as evidence has not changed its disposition of the Motion.

The Defendants filed a reply and statement of facts in response to the Statement. (ECF Nos. 126–27).

## 2. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is material (i.e., relevant) only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214 (11th Cir. 1995) (citation omitted). A disputed material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The court must view the evidence in the light most favorable to the nonmoving party and avoid weighing the evidence or making credibility determinations. *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (citations omitted); *see also Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). However, "[a]lthough all reasonable inferences are to be drawn in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable." *Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1049 (11th Cir. 2017) (citation omitted). Likewise, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted).

## 3. The Parties' Relevant Summary Judgment Evidence

On October 25, 2017, at Dade Correctional Institution ("Dade CI"), the Plaintiff was housed in J2109, a single cell in the Crisis Stabilization Unit of the Mental Health Unit ("CSU"), which provides specialized care to inmates suffering from severe mental health issues. (ECF No. 7 ¶¶ 2, 10). At approximately 11:00 a.m., another inmate in the CSU had an anxiety attack. (*Id.* ¶ 13). The Plaintiff was stressed out about correctional officers' treatment of that inmate and his impending transfer to South Florida Reception Center ("SFRC"). (ECF No. 107-1 at 41–42, 45–48). There was commotion in the CSU and other inmates were upset. (*Id.* at 43–44). The Plaintiff banged on his cell door and its flap opened. (*Id.* at 42, 44).

The door flap came to the top part of the Plaintiff's thighs. (*Id.* at 55). The Plaintiff was kneeling down with one of his arms outside the flap and the other hand on it. (*Id.* at 50, 55). Some correctional officers were trying to get him to calm down because his arms were outside the flap, which was prohibited. (*Id.* at 50, 53). However, they did not try to remove his arms because, "whenever an inmate has his arm sticking out [of] the flap," "their training policy is . . . not to approach the flap." (*Id.* at 50).[1]

Officer Pineda asked him why his arms were out of the flap. (*Id.* at 51). Officer Pineda walked away momentarily, then returned and closed the flap "on [the Plaintiff's hands]." (*Id.*) Officer Pineda did not order the Plaintiff to remove his hands. (*Id.*) The Plaintiff managed to free his arms because Officer Pineda "let up a little pressure" when he started "yelling and screaming." (*Id.* at 59). Officer Pineda closed the flap after the Plaintiff removed his arms. (*Id.*)

The Defendants describe the encounter somewhat differently. They contend that Officer Pineda ordered the Plaintiff to remove his hand from the flap and that the Plaintiff complied by removing his hand and standing up. (ECF No. 107 ¶ 23). Officer Pineda then tried to close the flap with one hand. (*Id.*) "As [Officer Pineda] lifted up the flap to secure it, [the Plaintiff] pushed open the flap, reached out and grabbed onto [his] body alarm and yanked it off [his] belt." (ECF No. 107-5 ¶ 23). The Plaintiff "pulled the alarm with such force and quickness that he caused [Officer Pineda] to be thrown up against his cell door." (*Id.* ¶ 24). The Plaintiff released Officer Pineda once "he got the alarm off of" him. (*Id.* ¶ 25). Officer Pineda immediately closed the flap. (*Id.*) The Plaintiff smashed the body alarm against the cell wall, causing it to break. (*Id.*) The Defendants contend that the Plaintiff's "own actions resulted in [the] Plaintiff hurting himself, by scratching himself against the flap, by causing swelling on his arm as it had to rub against the flap going out and then in." (ECF No. 106 at 7). The Plaintiff thus "caused his own injuries." (*Id.*) For his part, the Plaintiff disputes that he took Officer Pineda's body alarm. (ECF No. 107-1 at 57–58).

The Defendants submitted surveillance video of this incident. (*See* ECF No. 105; ECF No. 107-6 (Exhibit F)). Viewed in a light favorable to the Plaintiff, the video supports a reasonable finding that Officer Pineda closed the flap

---

[1] *See generally* Fla. Admin. Code Ann. r. 33-602.210(4)(b)5 ("If an inmate who is secured in a cell fails to comply with a lawful order to cease his or her prevention of staff from closing a food flap/cuff port cover, staff shall pursue an organized use of force."). An organized use of force is "[a]ny force that may be administered to control, escort, or geographically relocate an inmate, or to quell a disturbance in controlled conditions, when the immediate application is not necessary to prevent a hazard to any person." *Id.* r. 33-602.210(1)(s).

while the Plaintiff's arm and/or hand was in it, causing him to stand up and move around in pain in an effort to free his arm. (*See* Exhibit F at 11:49:02–11:49:20). True, the video is consistent with Officer Pineda's statement that the Plaintiff pulled him closer to him, causing Officer Pineda to hit the cell door. However, the video supports a reasonable finding that the Plaintiff did so *after* Officer Pineda had closed the Plaintiff's arm in the flap.[2]

The Plaintiff was bleeding and wanted medical attention. (ECF No. 107-1 at 56). The assault allegedly caused him to suffer a swollen hand with a flap imprint, skin detachment, and a cut. (*Id.* at 64). Further, his forearm was swollen for a couple of days. (*Id.* at 65). He received iodine, ointment, analgesics, antibiotics, and muscle relaxer. (*Id.*) Although he did not have any broken bones, his hand did not fully heal. (*Id.* at 65–66). He knows this because he cannot make a complete fist or write for more than two hours without stopping. (*Id.* at 66). Also, he cannot apply hard pressure on his hand or properly grip a pull-up bar. (*Id.* at 66–67). The doctor who read his X-ray allegedly told him that he might have nerve damage on the side of his hand. (*Id.* at 117).

The Defendants contend that the Plaintiff's post-incident medical exam showed "2 spots of blood on his right hand, [] swelling on his left arm, which was [1.5] inches long, [and] no lacerations." (ECF No. 107 ¶ 44). "The treatment provided was [that] his hand was cleaned and band aids were applied." (*Id.*) Further, the Defendants dispute that his hand did not fully heal, stating that his medical records show that "his right hand had a good range of motion." (*Id.* ¶ 56).

After the alleged assault, the Plaintiff declared a psychological emergency and requested "a spontaneous-use-of-force camera." (*Id.* at 60). Major Green allegedly told him that, if he did not leave the cell, she was "going to have to run a [cell extraction] team. And if [she ran] a team, [the Plaintiff knew] what they were going to do." (*Id.*) Shortly thereafter, Major Green allegedly stated, "If I have to run a team, you already know . . . what's going to happen next." (*Id.* at 61). The Plaintiff refused to leave his cell until a camera was present. (*Id.* at 61–62). Major Green then stated: "He [doesn't] run this. I run this. I'm going to show him who run[s] this." (*Id.* at 63).

The Plaintiff was assessed by medical at his cell at 12:08 p.m. (ECF No. 107 ¶ 37). When an officer with a handheld video camera came, the cell extraction team removed him without incident. (*Id.* ¶ 38; ECF No. 107-1 at 74–

---

[2] It is not fully clear from the video whether the Plaintiff took Office Pineda's body alarm. But that factual dispute is immaterial.

75). In addition to the team, Officer Levy, the camera operator, Major Green, Lt. Roque, and Nurse Concepcion were present. (*Id.* at 73).

The team escorted the Plaintiff to the medical examination room. (*Id.* at 80). Nurse Concepcion cleaned his wounds and gave him Band-Aids. (*Id.* at 81, 84). The Plaintiff had on hand and leg restraints. (*Id.* at 81). In an adjacent room, Officer Levy had a video camera. (*Id.* at 84). Also present were Major Green, Lt. Roque, and the cell extraction team. (*Id.*) After Nurse Concepcion finished treating him, Major Green stated that "this concludes the medical assessment" and directed the camera operator to stop recording. (*See id.* at 87–88; ECF No. 35 ¶ 45). Major Green then told a correctional official, "If he moves, hit him." (ECF No. 35 ¶ 46).

At that moment, two or three cell extraction team members entered the medical room. (ECF No. 107-1 at 88). They punched the Plaintiff in the head, causing him to fall. (*Id.*) As he lay in the fetal position, the team members stomped, kicked, and punched him. (*Id.*) The Plaintiff was restrained throughout the alleged assault. (*Id.* at 89).

Afterwards, Major Green and Sgt. Bain were the only correctional officials in the room. (*Id.* at 95). Sgt. Bain removed his restraints and told him to sit down. (*Id.* at 96). Major Green ordered the video camera to be turned on again. (*Id.* at 89; ECF No. 35 ¶ 53). Officer Levy started filming through the glass. (ECF No. 107-1 at 96). Lt. Roque states that there was a spontaneous use of force because the Plaintiff had become combative. (*Id.* at 91, 96; ECF No. 35 ¶ 54).

At some point after the assault, the Plaintiff lost consciousness. (ECF No. 107-1 at 97). Allegedly, the assault left him with a laceration on his head and mental and emotional injuries. (*Id.* at 115–16).

The Defendants' version of the facts is different. They contend that Sgt. Rodriguez and Sgt. Bain were in the exam room with the Plaintiff, preparing to strip search him in connection with his impending transfer to SFRC. (ECF No. 107 ¶ 46). Once his restraints were removed, he became aggressive and "combative with Sgt. Bain with closed fists." (*Id.* ¶¶ 47–48). The "Plaintiff was ordered to stop and did not comply and was therefore redirected to the floor by Sgt. Rodriguez but continued to resist control." (*Id.* ¶ 48). After he stopped moving, the Plaintiff was placed in a chair. (*Id.*)

Shortly after this alleged assault, because force was used, Officer Levy reported to the scene with a video camera. (*Id.* ¶ 49). Lt. Roque "did the lead in statement and the closing statement." (*Id.*) "The only injury to [the] Plaintiff was noted as [a] bump on the front of his forehead." (*Id.* ¶ 52; *see also id.* ¶ 55–56).

6

### 4. Discussion

#### *(1) Excessive Force Against Officer Pineda*

To establish a claim for excessive force based on a prison official's use of force, the prisoner must show that the official applied the force maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Courts consider the following nonexhaustive list of factors to determine whether a prison official's use of force on an inmate is malicious and sadistic: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the inmate's injury, if any. *Id.* at 7.

Here, a reasonable juror could only conclude that Officer Pineda's use of force constituted a good-faith effort to maintain or restore discipline. All the factors favor him. Regarding factor one, a reasonable juror could only conclude that he had a need to remove the Plaintiff's arms and hands from the flap. In his deposition, the Plaintiff conceded that he was not supposed to have his hands outside the flap. Officer Pineda so declared as well. (ECF No. 107-5 ¶ 10). The Plaintiff attempts to recant this concession in his Response. (ECF No. 124 at 11). However, Florida law requires an organized use of force where, as alleged here, a prisoner fails to comply with an order to close the food flap. Fla. Admin. Code Ann. r. 33-602.210(4)(b)5. This regulation shows that such conduct violates prison regulations. In short, a reasonable juror could only conclude that the Plaintiff was not allowed to have his arms and hands outside the food flap at that time.

The Plaintiff will point out that Officer Pineda used immediate force, not organized force, as Florida law may require in this situation. *See id.* r. 33-602.210(1)(s). However, there was a disturbance in the CSU and the Plaintiff himself was agitated. A reasonable juror could only conclude that Officer Pineda had an immediate need to maintain order and discipline in such a tense and uncertain situation by removing the Plaintiff's arms and hands from the flap. *See Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990) ("Prison guards . . . need not wait until disturbances reach dangerous proportions before responding."); *see also Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators [] should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." (citations omitted)).

Moreover, a correctional officer's failure to act in accordance with prison policy does not, *per se*, show that his actions were malicious and sadistic. *See Fennell v. Gilstrap*, 559 F.3d 1212, 1217 (11th Cir. 2009) (noting that "malicious and sadistic" standard is "higher than that required to show excessive force in violation of [county] policies"), *abrogated in part on other grounds as noted in Crocker v. Beatty*, 995 F.3d 1232, 1248 (11th Cir. 2021); *Howell v. Houston Cty., Ga.*, No. 5:09-CV-402 CAR, 2011 WL 3813288, at *4 (M.D. Ga. Aug. 26, 2011) ("Standard practices or departmental regulations do not set a constitutional floor. Here, the constitutional question is whether the officers acted with a malicious and sadistic intent to harm [prisoner]."). On this record, a reasonable juror could not conclude that Officer Pineda intentionally disregarded r. 33-602.210(1)(s) in removing the Plaintiff's arms and hands from the flap, or that any failure to follow this regulation showed his force was malicious and sadistic.[3]

Factor five also strongly favors Officer Pineda. His force allegedly caused the Plaintiff to suffer: vaguely described and largely transitory pain; a swollen hand and forearm; a flap imprint; skin detachment; a cut; and problems making a complete fist, writing for over two hours, and gripping a pull-up bar.[4] For these injuries, he received a Band-Aid, iodine, ointment, analgesics, antibiotics, and muscle relaxer. He no longer receives analgesics, (*see* ECF No. 107-1 at 119), and there is no evidence that he continues to receive the other treatments. He did not have any broken bones. A reasonable juror could only conclude that these injuries are *de minimis. Johnson v. Moody*, 206 F. App'x 880, 885 (11th Cir. 2006) (per curiam) ("The medical records belie [the prisoner's] claim that his injury was not *de minim[i]s* because he was given a tetanus shot, and he was subsequently treated with bandages and non-prescription pain relievers. [The inmate's] finger was not broken or fractured, and there is no evidence that he suffered any permanent injury or debilitating pain.").

Because factors one and five favor Officer Pineda so strongly, so does factor two. In short, a reasonable juror could only conclude that there was a close relationship between the need for force and the amount of force used. Officer Pineda sought to enforce the prison's rules by closing the flap. The

---

[3] At this stage, the Court must believe the Plaintiff's allegation that Officer Pineda did not order him to remove his arms and hands from the flap. But the mere failure to do so does not belie the Court's finding that a reasonable juror could only conclude that Officer Pineda had an immediate need to remove the Plaintiff's arms and hands from the flap.

[4] The conclusory, hearsay allegation that an unnamed doctor told the Plaintiff he "might" have nerve damage on the side of his hand fails to establish this alleged fact on summary judgment. *See Ellis*, 432 F.3d at 1326.

entire incident lasted no more than 18 seconds. The video corroborates Officer Pineda's statement that he used only "one of [his] hands" to try to close the flap. (ECF No. 107-5 ¶ 22). And this use of force caused the Plaintiff only *de minimis* injury.

Factor four also strong favors Officer Pineda. It is undisputed that the Plaintiff was assessed by medical at his cell after the incident. It is also undisputed that, after the Plaintiff agreed to leave the cell, he was escorted directly to the medical room, where Nurse Conception treated his *de minimis* injuries. Additionally, there is no evidence that Officer Pineda interfered with the Plaintiff's medical care.

Finally, factor three favors Officer Pineda. As discussed above, there was a disturbance in the CSU, the Plaintiff was agitated, and his arms and hands were outside of the flap in violation of prison policy. Furthermore, the Defendants contend, and the Plaintiff does not dispute, that he had thrown feces out of the flap approximately three weeks before the incident. (ECF No. 107 ¶ 6). Additionally, a week before the incident, the Plaintiff was issued a disciplinary report for another incident in which he slipped out of his restraints, refused to return the handcuffs to Officer Pineda, and "began banging on the cell with the chain and lock." (ECF No. 107 ¶ 7). Thus, Officer Pineda reasonably could have perceived his conduct as threatening.

In sum, the *Hudson* factors decisively favor Officer Pineda. Consequently, no reasonable juror could conclude that his use of force to close the flap was malicious and sadistic for the very purpose of harming the Plaintiff.[5]

The Eleventh Circuit's decision in *Moody* supports this disposition. There, the prisoner alleged that a correctional officer "intentionally kicked a metal tray door on [the prisoner's] hand in an attempt to break [his] finger, resulting in injury." 206 F. App'x at 881. The district court granted the defendants' motion for summary judgment, concluding that the prisoner "did not establish the subjective component because he did not show that [the officer] acted maliciously or sadistically to cause harm." *Id.* at 882. The Eleventh Circuit affirmed, finding that "[the officer] did not act maliciously or sadistically for several reasons." *Id.* at 884. They included the superficial nature of the prisoner's injuries, his prompt receipt of medical treatment after the incident, the lack of any threatening or abusive language from the officer, and the fact that his "kicking of the tray door with his foot was a single incident resulting in a minor injury." *Id.*

---

[5] The Plaintiff's declarations from other inmates do not change this result. The declarations are quite vague and merely cumulate the Plaintiff's version of the events. (ECF No. 125-1 at 2–3).

9

The facts here are materially indistinguishable from those in *Moody*. Officer Pineda tried to close the flap with one hand, which is arguably less forceful than kicking the flap. Furthermore, there is no evidence that he verbally abused the Plaintiff. (ECF No. 107-1 at 51, 54). Additionally, the Plaintiff's injuries were *de minimis* and he received prompt medical attention. Therefore, "although [Officer Pineda] arguably could have waited to see whether [the Plaintiff] would remove his hand from the [flap], [the Plaintiff] failed to produce evidence showing that this action was taken maliciously and sadistically for the very purpose of causing harm." *See id.* (citation and quotation marks omitted).[6]

### *(2)   Failure to Intervene Against Major Green and Sgt. Burton*

"An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." *Grimes v. Felder*, 747 F. App'x 752, 753 (11th Cir. 2018) (per curiam) (citation omitted). Here, a reasonable juror could not conclude that Officer Pineda used excessive force on the Plaintiff. So Major Green and Sgt. Burton cannot incur failure-to-intervene liability. *Tarpley v. Miami-Dade Cty.*, 212 F. Supp. 3d 1273, 1285 (S.D. Fla. 2016) (Scola, J.).

### *(3)   Failure to Protect Against Major Green*

As noted, the Court allowed the case to proceed on a failure-to-protect claim against Major Green for allegedly orchestrating the second assault on the Plaintiff by cell extraction team members. Upon further review of the record and governing authorities, this claim is properly analyzed as a "use-of-force" claim, not a "failure-to-protect" claim. *See Sepulveda v. Burnside*, 170 F. App'x 119, 122 (11th Cir. 2006) (per curiam). The crux of this claim is that Major Green "deliberately orchestrated the assault" by the cell extraction team members in the medical room. *See id.* at 123. If so, and if the assault were

---

[6] The Plaintiff contends throughout his papers that the Defendants spoliated evidence of audio recordings from the CSU. He also faults the Defendants for failing to preserve and produce the surveillance video from after the incident between him and Officer Pineda. However, the Defendants deny the existence of such an audio recording, (ECF No. 127 ¶ 15), and the Plaintiff's conclusory allegations fail to show otherwise. Furthermore, assuming such a recording existed, it is inconceivable that it would help him survive summary judgment on this claim. He alleges that Officer Pineda did not say anything to him during the incident. Also, given the case's posture, the Court must believe his allegation that he started screaming in pain when Officer Pineda closed the flap. So any audio recording corroborating this allegation would be cumulative and would not change the fact that no reasonable juror could conclude that Officer Pineda's force was malicious and sadistic. Likewise, any video of what happened after this incident would be irrelevant to the Plaintiff's excessive force claim against Officer Pineda.

excessive, such conduct would be "malicious and sadistic[] for the very purpose of inflicting harm to" the Plaintiff. *See id.*

Here, believing the Plaintiff's evidence and construing it favorably, a reasonable juror could conclude that the unnamed cell extraction team members used excessive force on him. The Plaintiff alleges that, while he was seated and wearing arm and leg restraints, the team members punched him in the head, causing him to fall, whereupon they stomped, kicked, and punched him as he lay in the fetal position. Such a gratuitous use of force on an allegedly "completely non-disruptive and compliant prisoner supports a reliable inference that the use of force . . . [violated] the Eighth Amendment[.]" *See Watson v. Edelen*, 76 F. Supp. 3d 1332, 1372 (N.D. Fla. 2015).

The Defendants contend that the Plaintiff suffered only a forehead knot, which contradicts his "claim that he was being kicked, punched, and stomped by [grown] men." (ECF No. 106 at 11). However, due to the Defendants' failure to provide a proper citation, the Court cannot find the evidence that allegedly shows that the Plaintiff suffered only a forehead knot. (ECF No. 107 ¶ 52 (citing Exhibit I, *BS* 369, which is not in Exhibit I); ECF No. 107-9). Furthermore, even if he suffered only a forehead knot, this argument invites the Court to weigh the evidence, which it cannot do on summary judgment.

The Plaintiff contends that he suffered a laceration and that he lost consciousness due to the alleged assault. Drawing all reasonable inferences in his favor, the post-assault, handheld video camera footage supports this allegation. In the exam room, he falls out of a chair and has to held up by a nurse and an officer. Furthermore, at this stage, there is no evidence conclusively contradicting his allegation that he received a laceration.[7] Believing this evidence and construing it favorably, a reasonable juror could conclude that these collective injuries were not *de minimis*. *See Hall v. McGhee*, 762 F. App'x 837, 845 (11th Cir. 2019) (per curiam) (noting that Eleventh Circuit has "found force not to be *de minimis* where a handcuffed plaintiff's head was slammed against the trunk after she had been secured, the plaintiff was punched in the stomach while handcuffed and not resisting, and the plaintiff, while handcuffed, was kicked and beat until unconscious (citations omitted)).[8]

---

[7] The Defendants contend that the video shows that the Plaintiff did not have a laceration and was not bleeding. However, laceration is synonymous with cut, and cuts can be quite small. Furthermore, the video does not afford the closest or clearest view of his face. Construing the evidence in his favor, a reasonable juror could conclude that he suffered a small cut that bled minimally and, hence, was not visible on the video.

[8] A reasonable juror would be able to find that the team members used excessive force on the Plaintiff even if his injuries were *de minimis*. *Wilkins v. Gaddy*, 559 U.S. 34 (2010) (per curiam),

11

That a reasonable juror could conclude that the team members used excessive force does not end the inquiry. The next issue is whether a reasonable juror could conclude that Major Green "deliberately orchestrated the assault" as the Plaintiff alleges. *See Sepulveda*, 170 F. App'x at 123. If so, this would support a finding that she was personally involved in and caused the assault. *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (personal involvement in constitutional violation necessary for individual liability in § 1983 suit); *Dixon v. Burke Cty., Ga.*, 303 F.3d 1271, 1275 (11th Cir. 2002) (plaintiff must show that the state actor's conduct caused the constitutional deprivation to prevail under § 1983).

Here, believing the Plaintiff's evidence and construing it favorably, a reasonable juror could conclude that Major Green intentionally orchestrated the alleged assault. Major Green allegedly told him that, if she "ran" an extraction team, he knew what they were going to do. Further, Major Green allegedly told him that she was "going to show him who runs this." Additionally, Major Green allegedly ordered an officer to stop recording, after which she said, "If he moves, hit him." The Plaintiff alleges that, immediately thereafter, the team members entered the room and assaulted him. Major Green's threatening language and orders to stop recording and hit the Plaintiff if he moved, if believed, support a reasonable finding that she encouraged or directed the team members to assault the Plaintiff. *See Sepulveda*, 170 F. App'x at 123; *Moody*, 206 F. App'x at 884.

The Court understands that the Defendants tell a different story. But they have not presented any video or other evidence blatantly contradicting the Plaintiff's story, which is reasonably detailed. "That presents [the Court] with a classic swearing match, which is the stuff of which jury trials are made." *Sears*, 922 F.3d at 1208 (citation and quotation marks omitted).[9]

---

"clarified that courts cannot find excessive force claims not actionable because the prisoner did not suffer more than *de minimis* injury," *Sconiers v. Lockhart*, 946 F.3d 1256, 1267 (11th Cir. 2020). *See also Wilkins*, 559 U.S. at 39 (holding that the "core judicial inquiry" under the Eighth Amendment is "the nature of the force," not "the extent of the injury" (citation omitted)). Considering the gratuitousness and maliciousness of the team members' alleged conduct, the Plaintiff's "good fortune to escape without serious injury" would not necessarily preclude a trial on his "excessive force claim." *See id.* at 38.

[9] If the Court understands him correctly, the Plaintiff alleges that the Defendants conspired to cover up this assault by destroying the handheld video that started when he left his cell and ended when Major Green told the camera operator to stop recording. (*See, e.g.*, ECF No. 107-1 at 109; ECF No. 124 at 15–16, 28). If the Court understands the Defendants correctly, they contend that no video of this period exists. (*See* ECF No. 126 at 1–3). At some point, video of the Plaintiff's being escorted to the medical room must have existed because there is no dispute that he would not leave his cell until a camera was present. But such video is irrelevant to the Plaintiff's excessive force claim against Major Green for allegedly orchestrating the assault at

In sum, a reasonable juror could conclude that Major Green used excessive force on the Plaintiff by ordering the team members to assault him.[10][11]

### 5. Conclusion

Accordingly, the Court **grants in part and denies in part** the Defendants' Motion (ECF No. 106), with the following results:

- The Court **grants** summary judgment in favor of the Defendants on the Plaintiff's excessive force claim against Officer Pineda and failure-to-intervene claim against Major Green and Sgt. Burton.

- The Court **denies** summary judgment on the Plaintiff's excessive force claim against Major Green.

It is further **ordered** that the Defendants shall **file** a status report by **July 16, 2021** in which, after telephonic consultation with the Plaintiff, they

---

issue. The Plaintiff's allegations do not relate to the period between when he left his cell and arrived at the medical room. True, video footage about whether the Plaintiff was in leg and arm restraints in the medical room and whether Major Green directed the camera operator to stop recording would be relevant. If the Court understands them correctly, the Defendants contend that such footage was never taken because: (1) Officer Pineda allegedly did not use any force against the Plaintiff; and (2) the Plaintiff had to be striped-searched in the exam room due to his impending transfer. (*See* ECF No. 126 at 1–3). A finding that the Defendants spoliated evidence would not be proper unless, at a minimum, the video actually existed. *See Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010) (O'Sullivan, M.J.) ("The party seeking spoliation sanctions must prove that the missing evidence existed at one time . . . ." (cleaned up)). The record is not sufficiently well developed to determine whether video relevant to the Plaintiff's excessive force claim against Major Green ever existed. Therefore, the Court will order the Parties to brief this issue in its order setting calendar call, trial date, and pretrial deadlines, which it will issue in due time. For now, the Court's decision not to resolve this issue in conjunction with the Motion does not prejudice the Plaintiff. This is because the Court has denied summary judgment on his excessive force claim against Major Green, which is the only claim to which the putative video relates.

[10] Because a reasonable juror can conclude that Major Green's conduct was malicious and sadistic in violation of the Eighth Amendment, qualified immunity is improper. *Fennell v. Gilstrap*, 559 F.3d 1212, 1216–17 (11th Cir. 2009).

[11] Although, given the posture of the case, the Court must deny summary judgment on this claim, the Court has some questions about its ultimate viability. At trial, unlike on summary judgment, the jury will be free to disbelieve the Plaintiff's evidence and make credibility determinations. Being based almost entirely on his largely uncorroborated testimony, the Plaintiff's evidence regarding the assault is not ideally strong. Furthermore, his seemingly dramatic behavior in the post-assault video may support an inference that he is malingering. For instance, he states at one point that the officers are choking him when clearly no one is. (ECF No. 107 ¶ 54).

state how long they anticipate the trial lasting and propose three trial dates to begin no earlier than February 7, 2022.[12]

**Done and ordered**, in chambers, in Miami, Florida, on July 6, 2021.

_____
Robert N. Scola, Jr.
United States District Judge

*Copies, via U.S. Mail, to*
Antonio L. Green
981309
New River Correctional Institution
Inmate Mail/Parcels
PO Box 900
Raiford, FL 32083
PRO SE

---

[12] The Court will look unfavorably upon unnecessarily long proposals regarding the length of the trial.